**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| TEXAS NATIONALIST MOVEMENT and DANIEL MILLER, individually and on behalf of all other similarly situated | § § § § | |
| Plaintiffs, | § | |
| v. | § § | CIVIL ACTION NO. 1:22-CV-572 JUDGE MICHAEL J. TRUNCALE |
| | § | |
| META PLATFORMS, INC. | § § | |
| Defendant. | § § § | |

**<u>DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

I.      **Introduction** ................................................................................................ 1

II.     **Background** .................................................................................................. 3

     A.      Meta and Its Online Services ................................................................ 3

     B.      Texas' Efforts to Curtail Meta's Editorial Judgments ........................... 3

     C.      Plaintiffs' Lawsuit ................................................................................ 6

III.    **Argument** ...................................................................................................... 7

     A.      The Complaint Fails to Allege a Violation of Texas Law ...................... 8

     B.      Even if the Complaint Stated a Claim, Federal Law Would Bar It ....................... 14

     C.      The Court Lacks Personal Jurisdiction Over Meta ................................ 27

IV.     **Conclusion** .................................................................................................. **30**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)............................................................................................18

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003)..................................................................15, 16, 17

*Am. Civil Liberties Union v. Johnson*,
  194 F.3d 1149 (10th Cir. 1999) ........................................................................15

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987)..........................................................................22, 24, 26

*Asurvio LP v. Malwarebytes Inc.*,
  2020 WL 1478345 (N.D. Cal. Mar. 26, 2020)..................................................12

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. Tex.*,
  571 U.S. 49 (2013)..............................................................................................1

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ....................................................................10, 13

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986)..........................................................................................15

*Buckley v. Valeo*,
  424 U.S. 1 (1976)........................................................................................23, 25

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010)..........................................................................................21

*Comer v. Murphy Oil USA, Inc.*,
  718 F.3d 460 (5th Cir. 2013) ..............................................................................7

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)....................................................................................27, 28

*Daniels v. Alphabet Inc.*,
  2021 WL 1222166 (N.D. Cal. 2021) ....................................................10, 11, 18

*Dennis v. Zuckerberg*,
  2017 WL 3873761 (N.D. Ohio Sept. 5, 2017)..................................................30

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
  518 U.S. 727 (1996)..........................................................................................19

*Dipp-Paz v. Facebook*,
  2019 WL 3205842 (S.D.N.Y. July 12, 2019) ..........................................................9

*Doe v. MySpace, Inc.*,
  474 F. Supp. 2d 843 (W.D. Tex. 2007)..........................................................10, 13

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ..................................................................9, 14, 17

*Domen v. Vimeo, Inc.*,
  433 F. Supp. 3d 592 (S.D.N.Y. 2020)...............................................10, 11, 12, 18

*In re Facebook, Inc.*,
  625 S.W.3d 80 (Tex. 2021)............................................................... *passim*

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012).........................................................................26, 27

*FTC v. Match Grp., Inc.*,
  2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ................................................. *passim*

*Georgalis v. Facebook, Inc.*,
  324 F. Supp. 3d 955 (N.D. Ohio 2018)......................................................29

*Gonzalez v. Google LLC*,
  No. 21-1333 .....................................................................................2, 8

*Gullen v. Facebook.com, Inc.*,
  2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ................................................30

*Harrison v. Facebook, Inc.*,
  2019 WL 1090779 (S.D. Ala. Jan. 17, 2019) ............................................30

*Head v. Las Vegas Sands, LLC*,
  298 F. Supp. 3d 963 (S.D. Tex. 2018) ......................................................28

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989)..............................................................15, 16, 17

*Hornsby v. Fish Meal Co.*,
  431 F.2d 865 (5th Cir. 1970) .................................................................2, 8

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995)..........................................................19, 21, 24, 25

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ..............................................................29

*KeyCity Cap., LLC v. Davenport Invs., LLC,*
  2022 WL 581146 (N.D. Tex. Feb. 25, 2022)............................................................1

*Knowles v. City of Waco, Tex.,*
  462 F.3d 430 (5th Cir. 2006) ..................................................................25

*La'Tiejira v. Facebook, Inc.,*
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ........................................... *passim*

*Lewis v. Wells Fargo Bank, N.A.,*
  939 F. Supp. 2d 634 (N.D. Tex. 2013) ..............................................3, 4, 5, 6

*Manhattan Cmty. Access Corp. v. Halleck,*
  139 S. Ct. 1921 (2019)............................................................................19

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018)..................................................................19, 23

*McCutcheon v. FEC,*
  572 U.S. 185 (2014).............................................................................25

*Meditrust Fin. Servs. Corp. v. Sterling Chem., Inc.,*
  168 F.3d 211 (5th Cir. 1999) ...............................................................14

*Mezey v. Twitter, Inc.,*
  2018 WL 5306769 (S.D. Fla. July 19, 2018) ........................................18

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974)...............................................................19, 20, 21, 25

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983)...........................................................................22, 23, 25

*NetChoice, LLC v. Att'y Gen., Fla.,*
  34 F.4th 1196 (11th Cir. 2022) .............................................................2, 21

*NetChoice, LLC v. Paxton,*
  142 S. Ct. 1715 (2022)..........................................................................2, 6, 7

*NetChoice, LLC v. Paxton,*
  49 F.4th 439 (5th Cir. 2022) ............................................................ *passim*

*NetChoice, LLC v. Paxton,*
  573 F. Supp. 3d 1092 (W.D. Tex. 2021)................................................6

*NetChoice, LLC v. Paxton,*
  No. 22-555 (S. Ct.)................................................................................7

*NIFLA v. Becerra*,
138 S. Ct 2361 (2018)..............................................................................21, 22, 26

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*,
511 U.S. 93 (1994)..........................................................................................15, 17

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
475 U.S. 1 (1986)..............................................................................18, 19, 21, 23

*Polk v. Almindinger*,
243 S.W. 682 (Tex. App. 1922)...................................................................8

*PSINet, Inc. v. Chapman*,
167 F. Supp. 2d 878 (W.D. Va. 2001).........................................................16

*Ralls v. Facebook*,
221 F. Supp. 3d 1237 (W.D. Wash. 2016)..................................................30

*Ranger Conveying & Supply Co. v. Davis*,
254 S.W.3d 471 (Tex. App. 2007)...............................................................8

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).............................................................................. *passim*

*Robinson v. Hunt Cnty., Tex.*,
921 F.3d 440 (5th Cir. 2019) .......................................................................14

*In re Rolls Royce Corp.*,
775 F.3d 671 (5th Cir. 2014) ........................................................................1

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
697 F. App'x 526 (9th Cir. 2017) ...............................................................18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).................................................................................22, 23

*Texas v. White*,
74 U.S. 700 (1868)........................................................................................11

*W.V. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943).................................................................................18, 24

*Walden v. Fiore*,
571 U.S. 277 (2014)......................................................................27, 28, 29, 30

*Wells v. Facebook Inc.*,
2019 WL 6894681 (D. Kan. Dec. 18, 2019)...............................................30

*Wilson v. Twitter, Inc.*,
   2020 WL 5985191 (S.D. W.Va. Sept. 17, 2020) ............................................................10, 20

*Winter v. Facebook, Inc.*,
   2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) ..........................................................10, 11, 20

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ..............................................................................................................18, 21

*Word of God Fellowship, Inc. v. Vimeo, Inc.*,
   205 A.D.3d 23 (N.Y. App. Div. 2022) .............................................................10, 11, 12, 18

*Zhang v. Baidu.com*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) ....................................................................................21

**Statutes**

47 U.S.C. §230 ..................................................................................................................... *passim*

Tex. Civ. Practices & Remedies Code §143A.001 ........................................................ *passim*

Tex. Civ. Practices & Remedies Code §143A.002 ..................................................................4

Tex. Civ. Practices & Remedies Code §143A.004 .....................................................5, 16, 22

Tex. Civ. Practices & Remedies Code §143A.006 ................................................................24

Tex. Civ. Practices & Remedies Code §143A.007 ...........................................................1, 7

Tex. Bus. & Com. Code §120.001(1)(C)(i) .....................................................................5, 24

## I.      INTRODUCTION

Plaintiffs wish to compel an out-of-state online service provider to disseminate content promoting secession from the Union.  That demand is addressed to the wrong Court, as Defendant Meta Platforms, Inc., explained in its pending motion to transfer.  ECF 7.  The Court should do nothing more with this case than send it to California.  *KeyCity Cap., LLC v. Davenport Invs., LLC*, 2022 WL 581146, at *2 (N.D. Tex. Feb. 25, 2022) (transfer is a "threshold ground[] for denying audience to a case on the merits" (quotation omitted)); *see Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. Tex.*, 571 U.S. 49, 65-66 (2013) ("a plaintiff who files suit in violation of a forum-selection clause … is entitled to no concomitant state-law advantages" (quotation omitted)); *In re Rolls Royce Corp.*, 775 F.3d 671, 676 (5th Cir. 2014) (requiring transfer).

But Plaintiffs' demand also fails as a matter of law.  Their sole allegation—that Meta blocked users of Facebook.com from posting a link to a different website—does not state a claim under Chapter 143A of the Texas Civil Practices and Remedies Code ("TCPRC").  Although Chapter 143A purports to forbid certain types of viewpoint discrimination—which is Plaintiffs' theory here—it further explains that a social-media service does ***not*** violate Texas law in the first place when the service acts in accordance with federal law that governs content moderation.  Federal law, in turn, twice-over establishes that Meta was entitled to block the link at issue.  *See* 47 U.S.C. §230(c)(1) & (c)(2).  Plaintiffs thus have not alleged any actionable "violat[ion]" at all.  TCPRC §143A.007(a).

This failure to state a claim under Texas law, however, is just one of the complaint's legal deficiencies.  Even if Plaintiffs had alleged a substantive violation of Chapter 143A, federal law would immediately bar the suit for several independent reasons.  First, the Commerce Clause forbids Texas from regulating Meta's decision in California to block the at-issue link.  Second, the

federal Communications Decency Act ("CDA") forecloses any claim based on Meta restricting Plaintiffs' content.  Third, the First Amendment bars these Plaintiffs from employing Texas law to compel Meta to disseminate their content.  Fourth, no Texas court may exercise personal jurisdiction over Meta because the complaint makes clear that the only contacts between this suit and Texas are those of the Plaintiffs' own creation—and not contacts created by Meta.

To be clear, Meta respectfully acknowledges that a fractured Fifth Circuit panel recently upheld Chapter 143A against a facial First Amendment challenge.  *NetChoice, LLC v. Paxton*, 49 F.4th 439 (2022).  But that decision—which repeatedly stressed unwillingness to proactively bar enforcement against "anyone at any time and under any circumstances"  "before [the law had] been applied"—said nothing about several of Meta's arguments, and is easily distinguishable on others.  *Id.* at 439, 444, 448, 451, 489 & n.3.  In any event, the Fifth Circuit stayed its mandate pending the Supreme Court's near-inevitable review of these issues in either *NetChoice* itself, or in a parallel Eleventh Circuit case where a unanimous panel found constitutional defects in a similar Florida law.  *See* ECF 1-6; *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022) (reinstating injunction); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022).  And the Supreme Court may also soon shed light on the CDA in *Gonzalez v. Google LLC*, No. 21-1333.[1]  So even if this Court were both to deny Meta's motion to transfer **and** to rule against Meta on dispositive arguments unaffected by *NetChoice*, the Court should reserve judgment on the remainder of Meta's arguments and stay the proceedings until the Supreme Court weighs in.  *See Hornsby v. Fish Meal Co.*, 431 F.2d 865, 866 & n.1 (5th Cir. 1970) ("[d]ecision in this case was deferred pending [the] Supreme Court['s]" resolution of "[w]hat was a perplexing issue …, an event for which we hopefully waited").

---

[1]   Supreme Court February Calendar, available at https://bit.ly/3Z1DDgw.

## II.  BACKGROUND

### A.  Meta and Its Online Services

Meta operates a variety of online services and applications, including Facebook.com. Facebook users can share content on the service and interact with it. That content is diverse and substantial: It is generated by billions of users located throughout the world, uploaded in a variety of media formats, and spans substantively the entire range of human thought—from the creative, humorous, and political, to the offensive and controversial.

Because of the sheer volume and breadth of this third-party content, Meta has invested significant resources into developing rules and standards to moderate and organize the user-created content for publication on Facebook. Although "Meta wants people to be able to talk openly about the issues that matter to them," it also recognizes that "the internet creates new and increased opportunities for abuse." Meta Transparency Center, *Facebook's Community Standards* (last visited Jan. 13, 2023), https://bit.ly/3tdKbtn. It therefore restricts several categories of content that it deems objectionable, such as hate speech, bullying, and harassment. *Id.*, *Hate Speech* (last visited Jan. 13, 2023), https://bit.ly/3LYTwxA; *id.*, *Bullying and Harassment* (last visited Jan. 13, 2023), https://bit.ly/3phMEBJ. Those policies are explained in Facebook's Community Standards, which users agree to follow under Facebook's Terms of Service.[2]

### B.  Texas' Efforts to Curtail Meta's Editorial Judgments

Meta makes billions of editorial decisions each day, so it is inevitable that some people will disagree with Meta's judgments and criticize them. Others will agree with them and praise them. The First Amendment and its preference for debate expect nothing less.

---

[2]  Although not necessary to deciding the merits, these public policies that are referenced in the complaint are subject to judicial notice. *E.g.*, ECF 3 ¶¶17-18; *see Lewis v. Wells Fargo Bank, N.A.*, 939 F. Supp. 2d 634, 637 & n.3 (N.D. Tex. 2013) (collecting cases).

But in September of 2021, Texas took a different tack.  Rather than creating its own, government-run forum to create new avenues for speech—an approach the Legislature considered[3]—Texas enacted Chapter 143A to punish Meta and a handful of companies like it for enforcing their private standards.  Relevant here, the law says that certain "social media platform[s]" in many cases cannot "censor"—*i.e.*, "block, ban, remove, deplatform, demonetize, de-boost, restrict, [or] deny equal access or visibility to"—"a user, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression; [or] (3) a user's geographic location in this state or any part of this state."  TCPRC §§143A.001(1), 143A.002(a)(1)-(3).  Users who can demonstrate that a social media platform has "violate[d] th[e law] with respect to the user" may seek injunctive relief, penalties, and attorney's fees. *Id.* §143A.007(a), (b).

Texas did not conceal its motivation for the statute: to target certain disfavored "social media platforms" for exercising their editorial judgment—and in particular for exercising such judgment outside of the borders of Texas.  Senator Brian Hughes, for example, noted that the law would "allow Texans to participate on the virtual public square free from Silicon Valley censorship."  Meta Ex. 1, Senator Bryan Hughes (@SenBryanHughes), TWITTER (Mar. 6, 2021, 4:48 AM), https://bit.ly/3HIVYbX.[4]  Senator Hughes further tweeted that "Texans must be able to speak without being censored by West Coast oligarchs."  Meta Ex. 2, Senator Bryan Hughes (@SenBryanHughes), TWITTER (Aug. 9, 2021, 9:34 PM), https://bit.ly/3v2fY1r.  And Governor Abbott—while signing the Act into law—claimed in his official capacity that "there is a dangerous movement by social media companies to silence conservative viewpoints and ideas."  Meta Ex. 3,

---

[3]    Tex. H.R. Journal, 87th Leg., 2d Spec. Sess. at 234 (2021), https://bit.ly/3t2JgLw.

[4]    The Court may notice these "matters of public record." *Lewis*, 939 F. Supp. 2d at 637 & n.3.

Governor Abbott Signs Law Protecting Texans from Wrongful Social Media Censorship, OFFICE OF THE TEX. GOVERNOR (Sept. 9, 2021), https://bit.ly/3jcldsQ.

The text of the Act reflects these discriminatory goals.  It singles out social media companies with 50 million monthly active users, such as Facebook, Pinterest, Instagram, TikTok, Twitter, and YouTube, for disfavored treatment.  TCPRC §143A.004(c).  At the same time, it does not include preferred speakers like Parler and Gab—indeed, the Legislature rejected an amendment that would have covered them[5]—and it excludes services that focus on "news, sports, [and] entertainment."  *Id.* §143A.001(4); Tex. Bus. & Com. Code §120.001(1)(C)(i).  The Act reaches beyond the borders of Texas to ensure that West Coast services are brought to heel.  *See* TCPRC §143A.004.  And the Act contains additional content-based carveouts.  For example, the "censorship" prohibitions do not apply to content that "is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment."  *Id.* §143A.006(a)(2).  Nor do they apply to content that "directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge."  *Id.* §143A.006(a)(3).

As things currently stand, the Western District of Texas entered a preliminary injunction against the law over a year ago.  That injunction is still in place—notwithstanding two interventions by the Fifth Circuit—because the Supreme Court vacated the Fifth Circuit's initial stay of the injunction, and the Fifth Circuit later stayed its most recent order vacating the injunction

---

[5]   Tex. H.R. Journal, 87th Leg. at 497-99 (2021), https://bit.ly/3Cq663o; Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from banning Texans for political views*, Texas Tribune (updated April 1, 2021), https://bit.ly/3nU2ceV.  "The [C]ourt may take judicial notice of [these] matters of public record."  *Lewis*, 939 F. Supp. 2d at 637 & n.3.

pending a second round of review by the Supreme Court.  *See NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021), *vacated and remanded*, 49 F.4th 439, *stayed by* Order of Oct. 12, 2022 (ECF 1-6); *see also NetChoice*, 142 S. Ct. 1715, *vacating stay granted in* 2022 WL 1537249 (5th Cir. May. 11, 2022).

### C. Plaintiffs' Lawsuit

The Texas Nationalist Movement ("TNM") is a nonprofit association that seeks Texas' secession from the United States.  *See* ECF 3 ¶¶6, 15.  Daniel Miller is its president.  *Id.* at 21.

Plaintiffs allege that Meta "prevented" Facebook users from posting the URL link to TNM's own website:  "TEXITnow.org."  *Id.*  ¶14.  That website—consistent with TNM's mission—claims that Texas should "exit[] the nation and becom[e] an independent, self-governing nation"; urges visitors "to get involved"; and solicits donations for this cause.  *See id.* at 21-33; ECF 1-11 (TNM homepage).[6]  According to the complaint, Meta's decision to block the link supposedly amounted to "censor[ship of] Plaintiffs because of their viewpoints in violation of Chapter 143A."  ECF 3 ¶¶1-2, 29.

Plaintiffs filed their complaint in Jefferson County Texas, despite having previously agreed to sue only in California and despite claiming that "all" purported "censorship [was] perpetrated against [them]" from "California."  *Id.*  ¶13.  The complaint seeks class-action treatment to vindicate the rights of "all persons" whom Meta allegedly blocked from posting the TNM link.  *Id.* ¶¶27-38.  As a remedy, Plaintiffs sought injunctive relief, a declaratory judgment, attorney's fees, and statutory penalties.  *Id.* ¶¶29, 48, 50-51, 61-62.

---

[6]  Although again unnecessary to deciding the merits of this motion, the Court may look to TNM's website.  *See Lewis*, 939 F. Supp. 2d at 637 & n.3.

On December 8, 2022, counsel for Meta informed counsel for Plaintiffs that Meta is no longer preventing its users from posting the TNM link.  Plaintiffs have not since reported any difficulties posting the link.

## III.   ARGUMENT

Plaintiffs fail to state a viable claim, let alone one that a Texas court may entertain.  Texas law, for one, prevents Plaintiffs from suing under Chapter 143A's private cause of action because Meta's alleged refusal to disseminate the TNM link cannot establish the "violat[ion]" required for a private suit.  TCPRC §143A.007(a)-(b).  Regardless, even if Plaintiffs could allege a state-law claim, several federal statutes and constitutional provisions would bar it.  And completely apart from the merits, this suit must be dismissed for lack of personal jurisdiction because Plaintiffs expressly and exclusively object to decisions that a California company made in California.

Meta respectfully acknowledges, however, that the Fifth Circuit's divided opinion in *NetChoice* touched on many (but not all) of these arguments in rejecting a facial First Amendment challenge.  But the Fifth Circuit stayed its own mandate[7] pending Supreme Court review, which at this point is all-but inevitable given that (1) the Supreme Court has already stepped in to reinstate the injunction; (2) *NetChoice* created a circuit split with a unanimous Eleventh Circuit panel that identified constitutional defects in Florida's similar law; and (3) the Attorney General of Texas has agreed that certiorari is appropriate.  *See NetChoice*, 142 S. Ct. 1715 (reinstating injunction); *id.* at 1716 (ALITO, J., dissenting) (acknowledging "issues of great importance that will plainly merit this Court's review); *NetChoice, LLC v. Paxton*, No. 22-555, Pet. for Writ of Certiorari at 8-12, 35 (Dec. 15, 2022); *NetChoice*, No. 20-555, Br. of Tex. Att'y Gen. at 1 (Dec. 20, 2022)

---

[7]   Until the mandate issues, the Court of Appeals' "decision[ is] not final" and "the original district court judgment remains in effect."  *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 467-68 (5th Cir. 2013) (quotation and brackets omitted).

("Respondent respectfully suggests this Court should grant both petitions."). And in February, the Supreme Court will hear argument in *Gonzalez*, which involves interpretation of the CDA.

Meta therefore advances a full suite of arguments here. And though the Court should not wait until "[f]ull daylight is … available" from the Supreme Court to either grant Meta's motion to transfer or adopt one of Meta's independent arguments for dismissal, to the extent this Court finds *NetChoice* critical to an otherwise-dispositive issue, it should defer judgment. *Hornsby*, 431 F.2d at 867 n.2. That approach promotes judicial efficiency and accuracy. And it imposes no prejudice on Plaintiffs given that Facebook users now may post the TNM link.

### A.    The Complaint Fails to Allege a Violation of Texas Law

Plaintiffs' allegations do not state a claim under the statute they invoke. Chapter 143A's private cause of action requires a plaintiff to "prove that the social media platform ***violated*** this chapter with respect to the user." *Id.* (emphasis added). To establish such a "violat[ion]," a plaintiff must start by showing—as Plaintiffs claim here—that the defendant restricted content "based on … viewpoint." *Id.* §143A.002; ECF 3 ¶¶1-2, 29. But that is not all. The law does not apply when a social media platform "censor[s] expression that [it] is specifically authorized to censor by federal law." *Id.* §143A.006(a)(1). Accordingly, Plaintiffs cannot plead the substantive "violat[ion]" necessary to their cause of action without establishing that federal law does not "specifically authorize[]" the alleged censorship. *Id.* §§143A.006(a)(1), .007(b); *see, e.g.*, *Polk v. Almindinger*, 243 S.W. 682, 864 (Tex. App. 1922) ("A cause of action is said to consist of three elements: The plaintiff's right, ***the violation of this right by defendant***, and the legal injury to the plaintiff by reason of such violation" (emphasis added and quotation omitted)); *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 478 (Tex. App. 2007) ("The burden is on a plaintiff to prove the existence and ***violation*** of a legal duty owed by the defendant …." (emphasis added)); *cf. NetChoice*, 49 F.4th at 446 (assuming the "narrow[ness]" of the law's "remedial scheme").

8

Plaintiffs' allegations are defective on this score.  Far from showing—as they must—that no federal law specifically authorized Meta to restrict the TNM link, the complaint's allegations actually establish that federal law twice-over permitted Meta to do just that.

<u>First</u>, subsection (c)(1) of the CDA[8] allows a social media service to forbid ***any*** content that the service itself did not generate.  "At its core," this provision entitles a service to engage in "a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content."  *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 992 (S.D. Tex. 2017) (quotation omitted).  This authorization applies "broadly in all cases arising from the publication of user-generated content."  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *accord FTC v. Match Grp., Inc.*, 2022 WL 877107, at *8 (N.D. Tex. Mar. 24, 2022).  All that is required is that (1) the defendant is the provider of an "interactive computer service"; (2) the lawsuit addresses the defendant's "publisher[]" activities—such as "the monitoring, screening, and deletion of user-generated content"; and (3) the content at issue was not "authored or created" by the defendant itself.  *La'Tiejira*, 272 F. Supp. 3d at 993-94 (emphasis omitted) (collecting cases).

This authorization to screen content squarely applies to the allegations in the complaint. There is no dispute that Meta's "Facebook['s] [service] satisfies the definition for [an] 'interactive computer service.'"  *Id.*; 47 U.S.C. §230(c)(1).[9]  The complaint specifically alleges that Meta engaged in the "publisher[]" activities of "screening" content, *La'Tiejira*, 272 F. Supp. 3d at 993— namely by "prevent[ing] each and every user from sharing the [TNM] link."  ECF 3 ¶¶14, 47; *see*

---

[8]  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).

[9]  This phrase encompasses "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. §230(f)(2).  Courts thus routinely find that social-media services qualify.  *E.g.*, *MySpace*, 528 F.3d at 419-20; *Dipp-Paz v. Facebook*, 2019 WL 3205842, at *3 (S.D.N.Y. July 12, 2019).

also *In re Facebook, Inc.*, 625 S.W.3d 80, 94 n.9 (Tex. 2021) (explaining that Facebook makes "editorial decision[s]" include "warnings, flagging of messages, or who may establish an account"); *Match Grp.*, 2022 WL 877107, at *8 ("[s]creening, blocking, monitoring, or editing allegedly harmful third-party content falls within a publisher's traditional editorial functions" (quotation omitted)); *Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 602 (S.D.N.Y. 2020) ("Vimeo plainly was acting as a 'publisher' when it deleted … Plaintiffs' content"); *Wilson v. Twitter, Inc.*, 2020 WL 5985191, at *4-5 (S.D. W.Va. Sept. 17, 2020) (collecting cases); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *5 (E.D. Mo. Nov. 22, 2021).  And the complaint admits that the TNM link was not "created or authored" by Meta, but rather that Plaintiffs themselves attempted to disseminate the link on Facebook.  *La'Tiejira*, 272 F. Supp. 3d at 993; *see e.g.*, ECF 3 ¶¶14, 47.  A basic application of subsection (c)(1) thus confirms Meta's authority.

Second, and independently, subsection (c)(2) of the CDA allows the "provider … of an interactive computer service" to prohibit "material that [it] considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."   47 U.S.C. §230(c)(2)(A).  Courts routinely invoke this provision—which does ***not*** "require that the material ***actually*** be objectionable"—to dismiss claims of censorship.  *E.g.*, *Domen*, 433 F. Supp. 3d at 603 (emphasis added) (termination of access based on content of videos); *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *12-13 (N.D. Cal. 2021); *Word of God Fellowship, Inc. v. Vimeo, Inc.*, 205 A.D.3d 23, 27-28 (N.Y. App. Div. 2022) (collecting cases).[10]  Provided that the defendant merely "consider[ed]" the material to be "objectionable"—regardless of whether that judgment involved

---

[10]   *See also Match Grp.*, 2022 WL 877107, at *11 ("Match is entitled to immunity for liability stemming from its actions (or inaction) in reviewing user accounts sending communications."); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 850 (W.D. Tex. 2007) ("the CDA also immunizes such services from liability based on efforts to self-regulate material."); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) (stressing the breadth of subsection (c)(2)).

overzealousness or even outright error—subsection (c)(2) applies.  47 U.S.C. §230(c)(2); *e.g.*, *Match Grp.*, 2022 WL 877107, at *10-11 (service allegedly was imprecise in "conduct[ing] or complet[ing] its 'fraud review process'"); *Domen*, 433 F. Supp. 3d at 604 & n.9; *Daniels*, 2021 WL 1222166, at *13; *Word of God*, 205 A.D.3d at 30 ("[Plaintiff]" has alleged only that [defendant] ***attempted*** to comply with its acceptable use policy." (emphasis added)).  Indeed, even "selective enforcement of content standards [falls] precisely" within Congress' grant of authority to social media services "to self-regulate" free from government interference.  *Winter*, 2021 WL 5446733, at *5.

This complaint fails to allege—as it must—that Meta lacked such authorization to restrict dissemination of the TNM link on Facebook.  In fact, it repeatedly pleads itself out of court. Plaintiffs claim, for example, that Meta blocked their link from being posted on Facebook as "go[ing] against [Meta's] Community Standards," ECF 3 ¶14—which is just another way of saying that Meta "applied its guidelines" to restrict Plaintiffs' content and "attempted to comply with its acceptable use policy."  *Domen*, 433 F. Supp. 3d at 604; *Word of God*, 205 A.D.3d at 30.  Plaintiffs also make clear that the disputed link promotes Texas' secession from the Union—an end that the Supreme Court has said would violate the Constitution.  *Compare Texas v. White*, 74 U.S. 700, 725 (1868) ("Considered therefore as transactions under the Constitution, the ordinance of secession … and all the acts of her legislature intended to give effect to that ordinance, were absolutely null."); *with* ECF 3 ¶¶14, 15 (describing TNM's "primary" mission of "withdraw[al] from the United States").  Under any fair interpretation of the phrase "otherwise objectionable," Meta was authorized to keep secessionist content off of its website.[11]

---

[11]  Courts have repeatedly indicated that the sole exception to this authorization is when the defendant engaged in "blocking or filtering [of] a direct competitor[] … for anticompetitive reasons."  *E.g.*, *Daniels*, 2021 WL 1222166, at *13; *Word of God*, 205 A.D.3d at 29-30

\*     \*     \*

To be sure, the Fifth Circuit's take on the *NetChoice* litigation proposed a narrower view of §230, albeit in the context of resolving a facial First Amendment challenge.  *See* 49 F.4th at 465-69.  But for several independent reasons, that since-stayed opinion—which did not attempt to determine how "the State [of Texas] would consider its law applicable" to specific cases given the "express[] permi[ssion]" to restrict "any content the Platforms are authorized to censor"—should not change the result here.  *Id.* at 452.

<u>First</u>, *NetChoice*'s passing observations about the scope of §230 were directed towards the facial attack at issue, hence the Court's rejection of the *NetChoice* challengers' supposed claim of "an unqualified censorship right."  49 F.4th at 468 n.23.  These observations also rested on the Court's recurring premise that the *NetChoice* challengers were ***not*** engaging in "editorial discretion" because they were simply making "***ex post***" decisions to remove content, instead of performing the sort of "*ex ante* review that typifies 'editorial discretion'" and is akin to the "*ex ante* curation [by] newspapers … that enjoys constitutional protection."  *Id.* at 465 & n.18 (emphasis added); *see also, e.g., id.* ("the Platforms do not choose or select material before transmitting it "); *id.* ("If the Platforms wanted the same protections [as newspapers], they could've used the same *ex ante* curation process."); *id.* at 483 ("The Platforms do not exercise the same

---

(collecting cases); *Asurvio LP v. Malwarebytes Inc.*, 2020 WL 1478345, at *5 (N.D. Cal. Mar. 26, 2020) ("[Plaintiff] does not allege, and cannot plausibly allege, that the parties are direct competitors.").  Any broader of an approach would "force a provider to litigate the question of whether what it blocked was or was not objectionable material" and thus "render §230(c)(2) nearly meaningless."  *Word of God*, 205 A.D.3d at 29 (quoting *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) (cleaned up)); *accord Domen*, 433 F. Supp. 3d at 604 n.9; *Match Grp.*, 2022 WL 877107, at *11 (Congress sought to avoid a "chilling effect" on service providers by conferring a broad power to screen material); *Facebook*, 625 S.W.3d at 87 (§230 "confers immunity from suit rather than a mere defense to liability, which is effectively lost if the case is erroneously permitted to go to trial" (quotation omitted)).

editorial discretion and control that cable operators do—for example, they do not make *ex ante* decisions ….”); *id.* at 488 (“the Platforms, of course, neither select, compose, nor edit (except in rare instances *after* dissemination)”); *id.* at 460 n.9 (recognizing possible distinctions in how services operate, but dismissing them as irrelevant in the context of a facial challenge).

Even assuming the premises of the *NetChoice* majority are correct (they are not, as indicated by the unanimous Eleventh Circuit's opinion and longstanding decisions from other courts in Texas and throughout the country),[12] these Plaintiffs cannot base liability on Meta's alleged *ex ante* decisions to proactively restrict dissemination of the TNM link on Facebook.  As the complaint explains, “Facebook users *attempted* to post TNM's link,” but “Meta *prevented* each and every user from sharing the link with a notice stating ‘Your content couldn't be shared.’”  ECF 3 ¶14 (emphases added).  The exhibits to the complaint similarly assert *ex ante* blocking, including Mr. Miller's assertion that “TNM attempted to share the link from its Facebook account and met with the same result.”  *Id.* at 21-22; *accord id.* ¶37 & at 24-33 (exhibits allegedly showing *ex ante* blocking).  This case—regardless of how the Fifth Circuit approached what it viewed as an abstract facial challenge in *NetChoice*—undeniably involves the exact sort of upfront editorial judgments that §230 (and the First Amendment) protects.  49 F.4th at 445.

Second, the *NetChoice* majority's analysis rested on the premise that “§230 is nothing more (or less) than a statutory patch to a gap in the First Amendment's free speech guarantee” that protects internet services from “[d]efamation liability.”  *Id.* at 467; *accord id.* at 466 (“Congress enacted Section 230 to [address] defamation liability”).  That narrow view, however, cannot be

---

[12]  *E.g.*, *Facebook*, 625 S.W.3d at 94 n.9 (Texas Supreme Court explains that Facebook makes “editorial decision[s]”); *La'Tiejira*, 272 F. Supp. 3d at 992-93; *MySpace, Inc.*, 474 F. Supp. 2d at 850; *Barnes*, 570 F.3d at 1102 (“[a]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune”); pp.9-11, *supra*.

squared with the Fifth Circuit's previous holding in *MySpace* that §230 applies to other sorts of issues like "negligence" and "gross negligence."  528 F.3d at 418; *see also id.* (recognizing that "Courts have construed the immunity provisions in §230 broadly in all cases").  Needless to say, "[w]hen panel decisions are in conflict, the earlier one controls."  *Meditrust Fin. Servs. Corp. v. Sterling Chem., Inc.*, 168 F.3d 211, 214 n.4 (5th Cir. 1999).

Third, *NetChoice*'s commentary is incompatible with settled precedent in yet another respect: the suggestion that the CDA's authorization to restrict "harassing" or "otherwise objectionable" material somehow "says nothing about viewpoint-based [discrimination]."  49 F.4th at 468.  That view cannot be squared with the rule that "censorship based on a … judgment that the content of protected speech is ***offensive or inappropriate is viewpoint discrimination***."  *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 447 (5th Cir. 2019) (emphasis added) (collecting Supreme Court authority); *accord id.* at 449 ("deleting 'inappropriate' comments is viewpoint discriminatory").  In other words, when Congress authorized restriction of content based on the "harassing" or "objectionable" nature of such content, it unavoidably recognized that such decisions might be based on viewpoint.  After all, what one person finds "harassing" or "objectionable," another person might find welcome or routine.

## B.    Even if the Complaint Stated a Claim, Federal Law Would Bar It

Because Texas law refers to federal standards, there is no need for the Court to engage in the familiar motion-to-dismiss analysis of whether "the face of the pleadings" show that federal law preempts Plaintiffs' state-law claim.  *Match Grp.*, 2022 WL 877107, at *6 (collecting cases).  But if the Court finds it simpler to treat federal law as preemptive of, instead of integral to, Texas law, the result is the same.  *Id.* at *12 (federal law applies "[n]o matter how artfully [the complaint is] pleaded").

14

1.      The Commerce Clause requires dismissal

The Commerce Clause prohibits Plaintiffs from using Texas law to control Meta's decisions.  U.S. Const. art. I, §8, cl. 3.[13]  While a literal reading of this provision reflects "a grant of regulatory power to Congress," the Commerce Clause also limits the powers of the states in several respects.  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994).  Most obvious, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," courts "generally str[ike] down the statute without further inquiry."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  Moreover, the Commerce Clause prohibits states from "regulating commerce occurring wholly outside [their] borders."  *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989).  States thus cannot dictate out-of-state activity even when it "has effects within the State."  *Id.* at 335-36.  Nor can they escape the Commerce Clause by claiming that no "extraterritorial reach was intended by the legislature."  *Id.*  If the "practical effect" of the law is "to control conduct beyond the boundaries of the State," it "exceeds the inherent limits of the enacting State's authority and is invalid."  *Id.* at 336.

This prohibition fully applies to regulation of content on the Internet, including state-law efforts to control online materials.  *E.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102-04 (2d Cir. 2003) (invalidating law that prohibited distribution of explicit materials to minors because it necessarily "'projected … into other States, and directly regulated commerce therein'" (quoting *Brown-Forman*, 476 U.S. at 584)) (collecting authorities); *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (invalidating New Mexico law that regulated

---

[13]   "The Congress shall have power … [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

"[d]issemination of material that is harmful to a minor by computer" on the ground that it "regulate[d] interstate conduct occurring outside New Mexico's borders"); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878 (W.D. Va. 2001) (similar).  After all, "[b]ecause the internet"—by its very nature—"does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'projecting its legislation into other States.'"  *Am. Booksellers*, 342 F.3d at 103 (quoting *Healy*, 491 U.S. at 334).

The Commerce Clause resolves this case too.  Plaintiffs explicitly allege a desire to reach out into "California—the very state from which all social media censorship is perpetrated"—and to use "Texas public policy" to control the decisions Meta makes in California that have ramifications not just for Texans, but users anywhere in the world.  ECF 3 ¶13.  This attempt to "project[ Texas'] regulatory regime into the jurisdiction of another State" is a nonstarter under settled doctrine.  *Healy*, 491 U.S. at 337.  Indeed, it is impossible to square that approach with "the Constitution's special concern … with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce."  *Id.* at 335-36.

The Commerce Clause also independently dooms Chapter 143A on its face.  The avowed purpose of the law is to target the decisions of "Silicon Valley"  and "West Coast oligarchs."  *See* pp.4-5, *supra*.  And by its plain terms, it does just that by regulating the choices that services make in other states that affect more than Texans.  *See* TCPRC §143A.004 (Chapter 143A applies if the content at issue was merely "share[d]  *or* receive[d] … in [Texas]" (emphasis added)).  For example, if Meta decides in California to block "information on [its] website or [in a Facebook] discussion group ... for the intended benefit of other people [outside of Texas]," Meta "must assume that someone from [Texas] may also" be affected by that decision—and thus poised to sue."  *Am. Booksellers*, 342 F.3d at 103 (internal quotation marks omitted).  Moreover, given that

the law forbids services from "deny[ing] *equal* access or visibility" based on "a user's geographic location in this state or any part of this state," TCPRC §§143A.001(1), .002(a)(2), it announces an impermissible (and functionally impossible) uniformity requirement with nationwide implications. *But see Healy*, 491 U.S. 324.  There is no avoiding the reality that Texas has projected—and indeed intends to project—its antipathy toward certain types of content moderation "onto the rest of the nation."  *Am. Booksellers*, 342 F.3d at 103.

The Commerce Clause leaves no room for any of this, let alone the inevitable race to the bottom that will result as other states "adopt[ ] similar [social-media] legislation" with "inconsistent" provisions.  *Healy*, 491 U.S. at 336-37.  Texas and Florida may be on the forefront of that movement.  *See NetChoice*, 49 F.4th at 488.  But the Commerce Clause cuts off that movement at the outset by preserving "a national economic union unfettered by state-imposed limitations" and by limiting "the autonomy of the individual States [to] their respective spheres." *Healy*, 491 U.S. at 335-36.  In other words, Texas has transgressed on the fundamental "principle that our economic unit is the *Nation*, which alone has the gamut of powers necessary to to control of the economy."  *Oregon Waste*, 511 U.S. at 98-99 (emphasis added and quotation omitted). "[T]he states"—let alone the internet—"are not separable economic units."  *Id.*   And the Constitution leaves zero room for the impending free-for-all over who will control the internet, or the "economic Balkanization" that will result from that contest.  *Id.* at 98 (quotation omitted); *see also Healy*, 491 U.S. at 336-37 (rejecting "inconsistent legislation").

2.      The Communications Decency Act Bars Plaintiffs' Claims

As explained above, the CDA doubly authorized Meta's alleged restriction of the TNM link.  First, subsection (c)(1) allowed Meta to "screen[]" Plaintiffs' postings.  *La'Tiejira*, 272 F. Supp. 3d at 993.  That alleged decision falls within the "traditional editorial functions" for which online services enjoy "broad[]" protections.  *Id.* at 992 (collecting cases); *MySpace,* 528 F.3d at

418 (collecting cases); *Facebook, Inc.*, 625 S.W.3d at 94 n.9; *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017); *Domen*, 433 F. Supp. 3d at 602-03; *Mezey v. Twitter, Inc.*, 2018 WL 5306769, at *2 (S.D. Fla. July 19, 2018).

Second, and again independently, subsection (c)(2) authorized Meta to restrict "objectionable" content—a broad grant of authority that applies even if the service was overzealous in applying its standards. *See, e.g.*, *Match Grp.*, 2022 WL 877107, at *11; *Daniels*, 2021 WL 1222166, at *13; *Word of God*, 205 A.D.3d at 30; *Domen*, 433 F. Supp. 3d at 603-04. Any other result would violate Congress' intent "to keep government interference in [Internet communication] to a minimum" in favor of allowing private social media services to develop tools to police objectionable content. *Domen*, 433 F. Supp. 3d at 600-01 (quotation omitted); *accord* 47 U.S.C. §230(a) & (b).

### 3.   Granting relief to Plaintiffs would violate the First Amendment

#### a.   The Court cannot compel Meta to publish the TNM link

The State of Texas cannot dictate what content Meta will disseminate on its privately owned website, Facebook.com.  The U.S. Supreme Court has repeatedly recognized the "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (quotation omitted).  That tenet protects "both the right to speak freely ***and*** the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (emphasis added). In its most obvious application, this rule prohibits the government from compelling private parties to "be[] the courier for [the government's own] message. *E.g.*, *id.* at 717; *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  But it also prevents the government from requiring private entities to disseminate or "associate with" the messages of private speakers too. *E.g.*, *Pac. Gas &*

*Elec. Co. v. Pub. Utils. Comm'n* ("*PG&E*"), 475 U.S. 1, 4 (1986) (plurality op.); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Any other approach would infringe the basic right of private parties to exercise "editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019).  The Supreme Court's decision in *Tornillo* is instructive. That case rejected a state law requiring newspapers to afford space in their publications to candidates for political office.  As the Court explained, the "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment."  *Tornillo*, 418 U.S. at 258.  Accordingly, the challenged law's "intrusion into the function of editors," even apart from any added costs or space constraints imposed on the paper, failed to "clear the barriers of the First Amendment."  *Id.*

The same analysis applies to Plaintiffs' desire to prevent Meta from exercising editorial control over the content on Facebook.  While *Tornillo* addressed a traditional newspaper, its core holding—that "the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996) (plurality op.) (quotation omitted)—is not "restricted to the press"; on the contrary, it applies equally to "business corporations generally," as well as to "ordinary people engaged in unsophisticated expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557,  574 (1995); *accord PG&E*, 475 U.S. at 8.  It is for that reason that a private utility cannot be forced to include third-party speech in its billing envelopes, *PG&E*, 475 U.S. at 20-21, a private parade organizer cannot be forced to include a group whose values it dislikes, *Hurley*, 515 U.S. at 574-76, and a private baker likely cannot be forced to bake a cake with a message he disapproves, *see Masterpiece*

19

*Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1743-44 (2018) (THOMAS, J., concurring in part and concurring in the judgment).

Meta is no different: especially on the allegations here that it affirmatively "prevented each and every [plaintiff] from sharing the [TNM] link." ECF 3 at 14. That sort of "*ex ante* review" "**before** th[e] content is posted"—as even *NetChoice* acknowledged—"typifies 'editorial discretion.'" 49 F.4th at 465 (quotation omitted). *NetChoice* thus repeatedly distinguished the facial challenge before it, in which Fifth Circuit believed the "Platforms [had] disclaimed *ex ante* curation," from cases where "platforms … moderate submissions before transmitting them." *Id.* at 465 & n.18; *see also* pp.12-13, *supra* (collecting examples). According to the Fifth Circuit, the latter form of "*ex ante* curation" is "arguably the same [process] that newspapers use for other material they publish and that enjoys constitutional protection," meaning that services should "use[] [an] *ex ante* curation process" if they "want[] the same protections." *Id.* at 465 & n.18.

Looking at Plaintiffs' own allegations here, Meta plainly "used th[at] *ex ante* curation process" that undeniably enjoys constitutional protection. *Id.*; *see, e.g.*, ECF 3 ¶14 & at 20-33 (allegations of *ex ante* blocking of the TNM link on Facebook). This sort of judgment is what countless courts have recognized as an "editorial" function. *E.g.*, *Facebook, Inc.*, 625 S.W.3d at 94 n.9 (citing *Tornillo*, 418 U.S. at 258); *La'Tiejira*, 272 F. Supp. 3d at 992 (collecting cases); *Wilson*, 2020 WL 5985191, at *4-5 (collecting cases); *Winter*, 2021 WL 5446733, at *5. And so the "concrete application[] of" Chapter 143A to Meta in **this** case, *NetChoice*, 49 F.4th at 451, necessarily runs afoul of the Supreme Court's longstanding admonition that "choice[s] of material[s]," "limitations on … content," "and treatment of public issues" all "constitute the exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 258.

20

Finally, Meta's alleged editorial judgments—affirmatively restricting content that users tried to post on Facebook—are also quintessentially expressive in their own right, as they convey a message about the type of content that Meta finds acceptable and the community that Meta hopes to foster.  *See La'Tiejira*, 272 F. Supp. 3d at 991 (recognizing "Facebook's First Amendment right to decide what to publish and what not to publish on its platform."); *cf. NetChoice*, 34 F.4th at 1204.  An injunction forcing Meta to "disseminate" speech that it would not otherwise disseminate, as Plaintiffs seek, would thus command Meta to "alter the expressive content" of its own message and "becom[e] the courier for [another's] message."  *Hurley*, 515 U.S. at 572-73; *Wooley*, 430 U.S. at 717; *see also NIFLA v. Becerra*, 138 S. Ct 2361, 2371 (2018).  That would flout the "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  *Hurley*, 515 U.S. at 573.  If it means nothing else, the Constitution ensures that private entities who wish to control what they publish may do so free from compulsion to publish another's content.  *PG&E*, 475 U.S. at 9-11; *Tornillo*, 418 U.S. at 258; *see also, e.g.*, *La'Tiejira*, 272 F. Supp. 3d at 991-92; *Zhang v. Baidu.com*, 10 F. Supp. 3d 433, 436, 439-41 (S.D.N.Y. 2014) ("the Supreme Court['s] … First Amendment jurisprudence all but compels the conclusion that" a plaintiff cannot "punish [a website" for … design[ing] its search-engine algorithms to favor certain expression").

b.   Plaintiffs' claims are grounded in content-based, speaker-based, and viewpoint-based discrimination

Allowing Plaintiffs' claims to proceed would also endorse discrimination based on speaker, viewpoint, and content, thus triggering strict scrutiny several times over.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 168-70 (2015).

<u>Speaker-based discrimination</u>.  Applying Chapter 143A to Meta would flout the basic "[p]rohibit[ion against] restrictions [that] distinguish[] among different speakers."  *Citizens United*

21

Case 1:22-cv-00572-MJT   Document 15   Filed 01/13/23   Page 29 of 38 PageID #:  620

*v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *see also Reed*, 576 U.S. at 170. The Texas law targets disfavored businesses ("Silicon Valley" and so-called "West Coast oligarchs") by using gerrymandered size requirements. *Compare* p.4, *supra*, *with* TCPRC §143A.004(c) (disavowing application to social media services with fewer than 50 million U.S. users). Indeed, the Texas Legislature exempted favored businesses, such as smaller social media services like conservative-favored Parler and Gab, and excluded the sports, news, and entertainment websites with which the State apparently has no disagreement. *See* TCPRC §§143A.001(4),.004(c); p.5 & n.5, *supra* (discussing proposed amendment). It is hard to imagine a law with more obvious speaker-based distinctions. *See, e.g.*, *Reed*, 576 U.S. at 170 ("[A] law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based."). This "targeting [of] individual members of [an industry] poses a particular danger of abuse by the State." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987).

Viewpoint-based discrimination. A law is viewpoint-based when it regulates "speech based on the specific motivating ideology or the opinion or perspective" at issue." *Reed*, 576 U.S. at 168 (quotation omitted). As just noted, the Texas Legislature gerrymandered the law to cover businesses with viewpoints the State dislikes, while exempting businesses with viewpoints the State favors. This "differential treatment" "suggests that the goal of the [law] is not unrelated to suppression of expression," "a goal [that] is presumptively unconstitutional." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983).

But one need not even engage in "suggest[ion]" here: it is no secret that Texas "designed" the law to "target" certain "speakers"—*i.e.*, Meta—"and their messages for disfavored treatment." *Id.*; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). The "history of the Act's passage" confirms as much. *NIFLA*, 138 S. Ct. at 2379 (KENNEDY, J., concurring); *see also Sorrell*, 564

22

U.S. at 564-65 (considering the legislature's desire to "diminish the effectiveness of marketing by manufacturers of brand-name drugs"); *Reed*, 576 U.S. 164 (the government cannot adopt laws "because of disagreement with the message the speech conveys" (cleaned up)); *Masterpiece Cakeshop*, 138 S. Ct. at 1729 (finding "clear and impermissible hostility toward the [plaintiff]"); *Minneapolis Star*, 460 U.S. at 580 (describing a prior decision that rejected a tax "imposed … with an intent to penalize a selected group of newspapers"). The Governor and legislators repeatedly denounced "Silicon Valley" and "West Coast Oligarchs" for "silenc[ing] conservative viewpoints and ideas," and they made clear that the law aimed to alter that purported balance. *See* pp.4-5, *supra*. But any such efforts to "level the playing field" in favor of the State's preferred viewpoints are verboten under the First Amendment—and attaching supposed partisan labels only makes matters worse. *See Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (the "concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"); *Sorrell*, 564 U.S. at 578-79 ("the state may not burden the speech of others in order to tilt public debate in a preferred direction"); *PG&E*, 475 U.S. at 20 (the state "cannot advance some points of view by burdening the expression of others"). Chapter 143A thus "goes even beyond mere content discrimination, to actual viewpoint discrimination," because "it is apparent that [the law] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565.

Content-based discrimination. A law is content-based where it "singles out specific subject matter for differential treatment." *Reed*, 576 U.S. at 163, 169. Here, Chapter 143A does not apply to several types of content, including that which (1) is "the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment'"; or (2) "directly incites criminal activity or

consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin, or ancestry, age, sex, or status as a peace officer or judge." TCPRC §143A.006(a)(2)-(3).  Moreover, the law wholly exempts other services that focus on certain types of "content":  namely "news, sports, [and] entertainment." *Id.* §143A.001(4); Tex. Bus. & Com. Code §120.001(1)(C)(i).  These differentiations between types of "subject matter" present "a paradigmatic example of content-based discrimination." *Reed*, 576 U.S. at 169.  Indeed, the Supreme Court has squarely rejected the "disturbing use of selective [legislation]" that favored publications "***devoted to … sports***"—just as Chapter 143A does here.  *Ark. Writers*, 481 U.S. at 229-31 (emphasis added).  Any requirement that Meta publish Plaintiffs' link would be based on "official scrutiny of … content" that "is entirely incompatible with the First Amendment[.]" *Id.*

To be sure, *NetChoice* addressed similar arguments, including that the law "impermissibly targeted the largest social media platforms."  49 F.4th at 482.  But its reasoning in the facial-challenge context is of little help to Plaintiffs here.  For example, the Fifth Circuit claimed that the *NetChoice* challengers "present[ed] no real evidence of the Texas legislature's alleged improper motives" and "simply ask[ed the Court] to infer [one]." *Id.*; *see also id.* at 481.  But Meta has cited clear public evidence that Texas sought to punish Meta and services like it.  And in a similar vein, the Fifth Circuit expressed its unwillingness to "hold unconstitutional a statute that is constitutional on its face." *Id.* at 482 (quotation omitted).  But here, Meta does not seek facial invalidation.  It seeks to protect its alleged editorial right to restrict *ex ante* a specific link.

> c.    Any level of First Amendment scrutiny is fatal to Plaintiffs' claims

This case cannot withstand constitutional scrutiny.  Meta's "choice" "not to propound" Plaintiffs' content "is presumed to lie beyond the government's power to control,"  meaning that any restriction of that choice is (at minimum) subject to strict scrutiny. *Hurley*, 515 U.S. at 575; *Barnett*, 319 U.S. at 633-34 ("involuntary affirmation c[an] be commanded only on even more

immediate and urgent grounds than silence").   And the content-based, speaker-based, and viewpoint-based applications of the law to Meta all require strict scrutiny in their own rights.  *Reed*, 576 U.S. at 170.

Plaintiffs may therefore proceed only if they can show that the law is "narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163, 171.  They cannot.  Indeed, Plaintiffs could not even satisfy intermediate scrutiny, as the law is not "narrowly tailored to serve a significant government interest" either.  *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 433-34 (5th Cir. 2006) (quotation omitted).

As an initial matter, there is no legitimate state interest—let alone a "compelling state interest[]"—at play.  *Reed*, 576 U.S. at 163.  Although Texas has expressed its desire to bolster certain "viewpoints and ideas," *see* pp.4-5, *supra*, this interest is not a proper basis to intrude on private social-media companies.  Whatever desire the State may have to "ensur[e] that a wide variety of views reach the public," that goal cannot justify compelling other private parties to publish speech they do not want to publish or to host content with which they disagree.  *Tornillo*, 418 U.S. at 247-48; *see also id.* at 251 (rejecting requirement that newspaper carry content even though "economic factors … have made entry into the marketplace of ideas served by the print media almost impossible"); *Hurley*, 515 U.S. at 577-78 (a state cannot coopt "an enviable vehicle for the dissemination of [other] views").  The "concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."  *Buckley*, 424 U.S. at 48-49.

Chapter 143A also flunks heightened scrutiny for lack of proper tailoring to "avoid unnecessary abridgement" of Meta's First Amendment rights.  *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality op.); *accord Minneapolis Star*, 460 U.S. at 592 ("the State's commitment to

[its supposed goal] is questionable"). The law is over- and under-inclusive, *i.e.*, non-tailored, in several ways. It is over-inclusive because the definition of "social media platform" sweeps in large providers regardless of whether they are tools for disseminating information and viewpoints. Indeed, it is ***intentionally*** overinclusive because Texas expressly rejected the actual pro-speech option—creating its own service—in favor of punishing and impairing the rights of Meta and private companies like it. *See* p.4 & n.3, *supra*. The law is also under-inclusive. There is no explanation for the arbitrary size requirements that punish Meta while intentionally exempting social media websites with a different perceived ideological bent, like Parler and Gab. *See* TCPRC §143A.004(c); pp.4-5, *supra*. "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376 (quotation marks and brackets omitted). And here, the "selective [treatment] of certain [platforms] … does not serve [the law's] alleged purpose in any significant way." *Ark. Writers*, 481 U.S. at 232.

### 4.     The law is impermissibly vague

Any application of Chapter 143A here would directly violate Meta's rights. But it also would require the Court to curtail Meta's freedoms on the strength of a law that is void for vagueness. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). When "speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54. Yet Texas—despite seeking to fundamentally alter the rules of the internet—has not even bothered to adequately describe its own law's reach.

To give just one example, Chapter 143A defines "censor" to include actions that "deny equal access or visibility to … expression." TCPRC § 143A.001(1). That requirement is

hopelessly indeterminate because, given the sheer volume of content on a covered service (which by definition has 50-million-plus users), it is impossible for services to determine if every single piece of content generated by tens of millions of users has "***equal*** access or visibility."  *Id.* (emphasis added).   Must Twitter stop identifying "trending" tweets?  Must YouTube ensure that its home page includes a link to every video on the site?  And must Instagram ensure that all photos are rendered at the same size and resolution?  Far more "precision and guidance are necessary" on these questions (and countless others like them) is necessary before Texas can reshape the world of social media and how such services work for users across the globe.  *Fox*, 567 U.S. at 253.

### C.    The Court Lacks Personal Jurisdiction Over Meta

Separate from the merits, dismissal is necessary for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  Hornbook law holds that a Texas court (and thus a federal district court in Texas) may not exercise personal jurisdiction over Meta absent a showing of "certain minimum contacts [with Texas] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quotation omitted). Those minimum contacts can take the form of "general jurisdiction" or "specific jurisdiction"— both of which are absent here.  *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014).

#### 1.    Meta is not subject to general jurisdiction

General personal jurisdiction exists only when a defendant's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State."  *Id.* at 127 (quotation omitted).  In virtually every instance, a corporation is "at home" solely in "its formal place of incorporation or principal place of business."  *Id.* at 139 n.19.  Only "in an exceptional case," such as when a corporation has temporarily relocated its principal place of business, is a corporation subject to general jurisdiction in an additional forum.  *Id.* at 139-40 nn.19-20 ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

Plaintiffs allege that Meta is a "foreign corporation whose corporate office is located" in California.  ECF 3 ¶8.  That much is true—Meta is incorporated in Delaware and headquartered in California.  ECF 1-4 ¶3.  But Plaintiffs identify no facts and make no argument establishing that this is an "exceptional" case warranting general jurisdiction.  *Daimler*, 571 U.S. at 128-131 & 139 n.19.  They merely allege in conclusory fashion that Meta has "continuous and systematic contacts with the State of Texas."  ECF 3 ¶10.  That is a recitation of a legal standard, not an allegation of fact.  It cannot be that "a forum has jurisdiction over a foreign defendant merely because of its highly interactive and transaction oriented web pages," because "then the same defendant is likely subject to the coercive authority of every state in the union."  *Head v. Las Vegas Sands, LLC*, 298 F. Supp. 3d 963, 978-79 (S.D. Tex. 2018).  General jurisdiction is far more exacting.

>    2.    Meta is not subject to specific jurisdiction because this lawsuit does not arise from ***Meta's own*** purported contacts with Texas

A court may not assert specific jurisdiction over a nonresident defendant unless the plaintiff shows that "the defendant's suit-related conduct … create[d] a substantial connection with the forum State."  *Walden*, 571 U.S. at 284.  This "substantial connection" "must arise out of contacts that the defendant ***himself*** creates with the forum State."  *Id.*  It is insufficient that the "defendant[ had] contacts with persons who reside there," even if the plaintiff is a resident of the State and litigation there would be "convenien[t for] plaintiffs or third parties."  *Id.* at 284-85.

This complaint falls well short of what the Supreme Court requires—as confirmed by several recent federal cases declining to find jurisdiction over social-media services.  All that Plaintiffs allege (in conclusory fashion) is that their "claims arise out of Meta's specific contacts with the State of Texas in contracting with Plaintiffs and censoring Plaintiffs in violation of Texas law."  ECF 3 ¶10.  But that approach is what *Walden* rejected:  Although Plaintiffs are correct that Meta "contract[ed] with Plaintiffs," *id.*—hence the forum-selection clause Plaintiffs would

otherwise ignore—that contract did not "envision[] continuing and wide-reaching contacts in the forum State." *Walden*, 571 U.S. at 285.  On the contrary, it centered the parties' relationship in ***California***.  Even weaker is Plaintiffs' claim that Meta "censor[ed them] in violation of Texas law," ECF 3 ¶10, as that allegation merely echoes the faulty premise that a plaintiff's efforts to enforce her or his rights in a State is enough to create jurisdiction therein.  *See Walden*, 571 U.S. at 286 (the Supreme Court has "declin[ed] to find personal jurisdiction in a State merely because the plaintiff in a child support action was residing there" (cleaned up and quotation omitted)).

Simply put, that Plaintiffs were supposedly "censored" and elected to "contract" with Meta by signing up for Facebook while Plaintiffs were located in Texas cannot establish jurisdiction over Meta.  Only Meta's contacts with Texas, as they relate to the specific claims here, are relevant.  And again, Plaintiffs allege no such contacts.  On the contrary, they allege that "California [is] the very state from which ***all*** social media censorship is perpetrated."  ECF 3 ¶13 (emphasis added).  Black-letter law holds that the mere fact a California company made decisions in California that allegedly harmed a Texas resident cannot create personal jurisdiction in Texas.  *Walden*, 571 U.S. at 286 ("a defendant's relationship with a plaintiff or third party, standing alone, is … insufficient").

Recent decisions involving online services prove the point: there is no personal jurisdiction based only on a defendant's website that was "presumably directed at the entire world."  *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318-20 (5th Cir. 2021).  Courts thus frequently decline to exercise personal jurisdiction over Meta based on its provision and regulation of online services, or on its users' interactions with those services.  *See, e.g.*, *Georgalis v. Facebook, Inc.*, 324 F. Supp. 3d 955, 961 (N.D. Ohio 2018) ("Plaintiff's broad allegation that Defendant deleted content posted by a Facebook user who happens to reside in Ohio also fails to establish … specific

jurisdiction in Ohio"); *Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at *2-3 (N.D. Ill. Jan. 21, 2016) ("plaintiff alleges that Facebook uses [its features] and … software on all uploaded photos, not just those uploaded in or by residents of Illinois"); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1244 (W.D. Wash. 2016) ("[P]ersonal jurisdiction over Facebook may not exist simply because a user avails himself of Facebook's services in a state other than the states in which Facebook is incorporated and has its principal place of business.").[14]

The same result is required here, especially on Plaintiffs' threadbare allegations that focus on their *own* conduct and *own* connections with Texas—and that expressly situate Meta's conduct in "California."  ECF 3 ¶¶10, 13.  Bedrock "notions of fair play and substantial justice" are incompatible with subjecting every company that offers an online service to lawsuits in all 50 states simply because its users live in all 50 states.  *Walden*, 571 U.S. at 283 (quotation omitted).

## IV.    CONCLUSION

As Meta explained in its threshold motion to transfer, the Court should not reach the merits. Plaintiffs have sued in the wrong forum, and transfer to the Northern District of California is required.  But if the Court reaches the merits, it should dismiss the complaint with prejudice.

---

[14]   *See also, e.g.*, *Harrison v. Facebook, Inc.*, 2019 WL 1090779, at *4 (S.D. Ala. Jan. 17, 2019) ("Plaintiff's allegations that Facebook failed to delete content that she or her agent, who happen to be residents of Alabama, posted on her Facebook page fail to show 'with reasonable particularity any specific conduct … by [Facebook] that would support an exercise of specific jurisdiction' in Alabama."); *Wells v. Facebook Inc.*, 2019 WL 6894681, at *1, 5 (D. Kan. Dec. 18, 2019) (plaintiff who claimed that Facebook "uploaded internet cookies to [her] social media profiles" failed to show Facebook had sufficient contacts to support personal jurisdiction); *Dennis v. Zuckerberg*, 2017 WL 3873761, at *2 (N.D. Ohio Sept. 5, 2017) (plaintiff failed to show specific jurisdiction).

Dated: January 13, 2023                    Respectfully submitted,

                                           */s/ J. Thad Heartfield*_____

                                           **THE HEARTFIELD LAW FIRM**
                                           J. Thad Heartfield
                                           State Bar No. 09346800
                                           thad@heartfieldlawfirm.com
                                           M. Dru Montgomery
                                           State Bar No. 24010800
                                           dru@heartfieldlawfirm.com
                                           2195 Dowlen Road,
                                           Beaumont, TX 77706
                                           Telephone: 409-866-3318
                                           Facsimile: 409-866-5789

                                           **KIRKLAND & ELLIS LLP**
                                           Taj J. Clayton, P.C.
                                           taj.clayton@kirkland.com
                                           State Bar No. 24050427
                                           4550 Travis Street
                                           Dallas, Texas 75205
                                           Telephone: 214-972-1757
                                           Facsimile: 214-972-1771

                                           *Attorneys for Meta Platforms, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on January 13, 2023.

                                           */s/ J. Thad Heartfield*_____
                                           J. Thad Heartfield

31